# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIAM NALLY, | ) |
| | ) Case No. 13-cv-7268 |
| Plaintiff, | ) |
| | ) Judge Sharon Johnson Coleman |
| v. | ) |
| | ) |
| PARTHASARATHI GHOSH, M.D., LIPING ZHANG, M.D., and WEXFORD HEALTH SOURCES, INC., | ) ) ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Nally brings this action against defendants Parthasarathi Ghosh, M.D., Liping Zhang, M.D., and Wexford Health Sources, Inc., alleging that they violated his constitutional rights by providing deficient medical care and knowingly disregarding the risk of serious harm. Defendants move for summary judgment [95], arguing that Dr. Ghosh and Dr. Zhang were not deliberately indifferent to Nally's medical needs because Nally was not diabetic or even prediabetic during their tenure caring for him, and assuming that he had been, Dr. Ghosh and Dr. Zhang were not deliberately indifferent to Nally's medical needs. Further, defendants argue that there is nothing in the record to establish that Wexford maintained an unconstitutional policy or practice. For the reasons set forth herein, that motion is denied.

**Rule 56.1 Statements**

As an initial matter, the Court turns to the sufficiency of the parties' Rule 56.1 statements. Defendants object that Nally's Rule 56.1(b)(3)(C) statements violate Local Rule 56.1 because they are not short and concise. Although "a district court is entitled to expect strict compliance with Rule 56.1," *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), Nally's statement

1

of additional facts complies with the spirit of the rule and is not so disruptive to the Court's decision-making process to warrant non-consideration of these facts.

**Background**

The following facts are undisputed unless otherwise noted. Nally is an inmate with the Illinois Department of Corrections and has been incarcerated at Stateville Correctional Center since 2005. He arrived with a myriad of medical issues, including heart disease, hypertension, high cholesterol, and Hepatitis-C. Nally has a family history of diabetes and has gained significant weight since arriving at Stateville.

Dr. Ghosh was the Medical Director at Stateville from June 2003 to March 31, 2011, when he retired from the practice of medicine. He was an Internal Medicine physician and board certified Endocrinologist, meaning that he was trained specifically in the treatment of diabetes. Although Dr. Ghosh was not directly responsible for the day-to-day care of all the inmates at Stateville, he saw patients by referral from staff physicians, including Nally. Dr. Ghosh recalls seeing Nally as a patient in the Hepatitis-C clinic.

Dr. Zhang was a staff physician at Stateville until June 2010. She was board certified in Family Medicine and reported to Dr. Ghosh. Her job duties involved providing general medical services to the inmate population, including staffing the diabetes and hypertension clinics.

Prediabetes is a serious medical condition, and patients with prediabetes are at an increased risk of developing type 2 diabetes and associated complications, such as kidney failure, blindness, nerve damage, heart disease, and stroke. There are no clear symptoms of prediabetes, and patients with prediabetes generally are asymptomatic. Testing for prediabetes and risk for future diabetes in a symptomatic people should be considered in adults of any age who are overweight. The risk of prediabetes progressing to type 2 diabetes increases if it is ignored.

Type 2 diabetes is also a serious medical condition and chronic illness of the pancreas with insulin resistance as the hallmark pathophysiology. Risk factors for diabetes, include obesity, poor nutrition, and a family history of diabetes. Common systems of type 2 diabetes can include increased thirst and hunger, frequent urination, fatigue, blurred vision, headaches, and tingling, pain, or numbness in the hands and feet, although patients with diabetes often have no symptoms at all.

Diabetes can be diagnosed in four different ways: (1) a hemoglobin A1c reading of greater than 6.5%; (2) a fasting blood glucose reading of 126 mg/dl (milligrams per deciliter) or greater, provided that the individual fasted for at least eight hours before the test; (3) an oral glucose tolerance test with a blood glucose of 200 mg/dl or greater provided that the individual receives 75 g of glucose dissolved in water prior to testing; and (4) a random, blood glucose level equal to or greater than 200 mg/dl, although the parties dispute whether this test must be accompanied by diabetic symptoms. For all four tests, an abnormal result should be followed closely by a second test to confirm the diagnosis.

Nally was regularly seen in the Hepatitis-C clinic at Stateville since 2005, and had 16 blood tests conducted over a period of more than five years. Nally testified that he fasted before each of his blood tests at Stateville. The first was on May 20, 2005, and showed a glucose count of 121 mg/dl, which was classified as "out of range." In the 15 additional blood glucose tests Nally had by the end of 2010, his glucose was classified as "out of range" 11 more times. On February 19, 2008, Nally's blood glucose was 200 mg/dl, but his next blood test was not until August 29, 2008. Additionally, his test on October 16, 2007, indicated a hemoglobin A1c level of 6.3%, which is considered prediabetic. Dr. Zhang testified that when a patient has a blood glucose level indicative of prediabetes, such as the October 2007 level, the physician should educate the patient regarding exercise, weight control, and diet as ways to prevent diabetes. Dr. Zhang further indicated that

3

additional blood glucose testing should have followed both the October 2007 and February 2008 tests.

Dr. Ghosh testified that a fasting blood glucose of 126 mg/dl or more and a nonfasting blood glucose of 200 mg/dl or more are in the diabetic range. Both results warrant a follow up A1c test. Dr. Ghosh also testified that a patient near the diabetic range should be counseled regarding the importance of diet and exercise in helping prevent diabetes. However, Dr. Ghosh had access to all of Nally's blood glucose test results and testified that he did not review them with Nally, because he would not inform a patient that he is diabetic until the nonfasting blood glucose is persistently 200 mg/dl or more. If he had been treating Nally in a hospital outside of Stateville, Dr. Ghosh testified that he would have informed Nally of the blood glucose result of 200 mg/dl. Further, Dr. Ghosh did not order follow up tests, which he stated would have been done in the hypertension clinic. Rather, Nally's test were too spaced out to qualify as the necessary follow up to an out of range blood glucose level.

Dr. Zhang testified that it is her responsibility to monitor blood glucose levels if required by the community standard of care and that it is important to review pertinent lab results with patients. She saw Nally for an annual physical examination on June 29, 2009 where she fully assessed him. Despite having reviewed Nally's history and lab results, Dr. Zhang did not discuss any of Nally's blood glucose test results with him or counsel him about lifestyle modifications that can slow or stop the progression of diabetes. Dr. Zhang testified that she had "no idea" who was responsible for determining whether an inmate should be enrolled in the diabetic clinic.

Nally testified that prior to November 2010 he was not informed by anyone that his blood glucose counts were out of range. Although Nally had been counseled on at least five occasions about a diet related to hypertension, he was not counseled regarding a diet to help prevent diabetes, which is low-sugar rather than low-salt.

4

In November 2010, Dr. Ghosh referred Nally to an outside hospital following complaints of chest pain. On November 23, 2010, Nally had a random blood glucose reading of 226 mg/dl on November 23, 2010, which his cardiologist determined indicated that Nally may have diabetes and referred him for additional diabetes screening at Stateville. A follow up test on December 8, 2010, showed a blood glucose reading of 222 mg/dl and an A1c reading of 5.6%. Then Nally was referred to the diabetes clinic at Stateville where he was treated for diabetes. Initially, Nally was provided with medication to address his blood glucose. The diabetes clinic later switched Nally to insulin injections, which he has continued to receive regularly. Since being treated for diabetes, Nally has modified his diet to reduce his sugar intake and exercises when his is able.

Defendant Wexford Health Sources, Inc. is a corporation contracted to provide certain medical staffing and healthcare services for the Illinois Department of Corrections, including at the Stateville Correctional Center. Wexford's provider handbook, which was available at Stateville, listed cost as a consideration in providing medical services to inmates. The Illinois Department of Corrections diabetes treatment guidelines state that "[f]or patients with suspected new onset diabetes, the diagnosis must be made with fasting blood sugar ≥ 126, or … random blood sugar ≥ 200." (Dkt. 110-15.) However, during the period at issue, it was Wexford's practice to not inform patients of blood test results that were not significantly or unexpectedly abnormal, unless the patient asked.

**Legal Standard**

Summary judgment is proper when the pleadings, the discovery materials, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986). A genuine factual dispute exists when there is enough evidence that a reasonable jury could find in favor of the nonmoving party. *Whiting v. Wexford Health*

*Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016). In determining whether or not a genuine issue of material fact exists, this Court must view the evidence and draw all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Discussion**

Deliberate indifference to a prisoner's serious medical needs violates the cruel and unusual punishments clause of the Eighth Amendment. *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 101, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A plaintiff alleging that a prison official acted with deliberate indifference to a serious injury or medical need must show that an objectively serious injury or medical need was deprived, and that the official knew that the risk of injury was substantial but still failed to take reasonable measures to prevent it. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). To make a showing that a prison official was deliberately indifferent to a prisoner's medical needs, a plaintiff must show that the medical professional was aware of the risk of harm but disregarded the risk nonetheless. *Chapman*, 241 F.3d at 845.

A prison official can act with deliberate indifference by: (1) failing to act, *Gayton*, 593 F.3d at 623–24; (2) delaying necessary treatment and aggravating the condition, *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); or (3) choosing an "easier and less efficacious treatment without exercising professional judgment," *id.* at 641 (internal citations and quotations omitted). When a plaintiff

6

alleges that medical services were delayed, the plaintiff must also place in the record "verifying medical evidence" demonstrating that the delay had a detrimental effect. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996); *see also Williams*, 491 F.3d at 714–715 (discussing the "verifying evidence" requirement). Whether a medical condition is "serious" and whether a defendant was "deliberately indifferent" to that condition are "fact questions, to be resolved by a jury if a plaintiff provides enough evidence to survive summary judgment." *Gayton*, 593 F.3d at 620.

First, defendants argue that Nally was not diabetic when Dr. Ghosh and Dr. Zhang worked at Stateville. It is undisputed that Nally's blood glucose results were out of range multiple times when he was under the case of Dr. Ghosh and Dr. Zhang. Putting aside the parties' dispute of material fact regarding whether Nally was diabetic at a certain time, the evidence construed in his favor demonstrates that Nally was prediabetic, which defendants admit is a serious medical condition. As Dr. Zhang testified, Nally was prediabetic in October 2007, and he continued to have regularly scheduled blood tests that presented blood glucose at abnormal levels consistent with prediabetes. Nally has demonstrated that he had an objectively serious medical need while under the care of Dr. Ghosh and Dr. Zhang.

The real issue, then, is whether Dr. Ghosh or Dr. Zhang intentionally or with deliberate indifference ignored Nally's prediabetes. Defendants argue that Dr. Ghosh and Dr. Zhang were not deliberately indifferent because they acted appropriately at all times and did not withhold necessary medical treatment. However, the record evidence, when viewed in Nally's favor, is sufficient for a jury to find repeated instances where both doctors chose not to order additional testing and delayed treatment for prediabetes that denied Nally the possibility to prevent diabetes. Dr. Ghosh testified that a prediabetic patient should be counseled regarding the importance of diet and exercise in helping prevent diabetes and informed regarding abnormal blood glucose results. In Nally's case, Dr. Ghosh admits that he regularly reviewed Nally's medical file and personally had appointments

7

with Nally, but neither counseled Nally nor reviewed Nally's irregular test results with him. Additionally, Dr. Ghosh failed to order follow up blood testing.

Dr. Zhang also confirmed that it is important for a physician to review lab results and educate a patient with prediabetes about life style changes that can help prevent diabetes. She further testified that it generally was her responsibility to monitor her patients with abnormal blood glucose levels. Regarding Nally, Dr. Zhang confirmed specific instances in 2007 and 2008 when he should have received additional blood glucose testing. However, Dr. Zhang also failed to discuss Nally's blood glucose test results with him or counsel him about lifestyle modifications that can slow or stop the progression of diabetes. Like Dr. Ghosh, Dr. Zhang admitted that she did not order additional blood testing after reviewing out of range blood glucose levels.

As a result, both Dr. Ghosh and Dr. Zhang ignored their own statements regarding proper treatment for a patient who displays signs of prediabetes. *See Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011). Both physicians' actions denied Nally the opportunity to be educated regarding his serious medical condition of prediabetes and make important changes to his lifestyle. The evidence, when resolved in Nally's favor, raises questions of material fact as to whether Dr. Ghosh and Dr. Zhang exhibited deliberate indifference in failing to treat Nally's prediabetes, and thereby precludes summary judgment for defendants. *See Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000).

Defendants also move for summary judgment on Nally's Eighth Amendment claim against Wexford. In support, Nally contends that Wexford maintained a series of express and implied policies that were deliberately indifferent to Nally's serious medical needs. Specifically, Nally complains about Wexford's purported practices of: (1) maintaining written policies that prioritized cost-savings over patient care; (2) compartmentalizing the care of its patients and addressing only discreet issues rather than considering the patient as a whole and addressing signs of serious medical

8

need; and (3) understaffing its healthcare units that resulted in inmates' medical needs going untreated.

To recover on a deliberate indifference claim against a corporate entity, plaintiffs must allege that their constitutional injury was caused by a corporate policy, custom, or practice. *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). A plaintiff can demonstrate that such a policy, custom or practice existed in three different ways. First, a plaintiff may present evidence that a corporate defendant maintained an express policy that would cause a constitutional violation when enforced. *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012). A plaintiff may also present evidence of a widespread practice that is "so permanent and well-settled that it constitutes a custom or practice." *Id.* (internal citations and quotations omitted). Finally, a plaintiff may allege that the constitutional injury was caused by an individual with final policymaking authority. *Id.*

Defendants argue that Nally has not presented evidence of a Wexford policy that created a risk of serious harm or evidence of a series of bad acts that together raise an inference of an unconstitutional policy. It is certainly true that "isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [Nally's] needs." *Shields*, 746 F.3d at 796. But Nally has introduced evidence that, over a multi-year period, Dr. Ghosh and Dr. Zhang followed a practice of not reviewing abnormal blood glucose results with Nally, not referring him for follow-up blood work, and not counseling him regarding a diabetic preventative diet. Indeed, Wexford admits that it was Wexford's practice to not inform patients of blood test results unless they were significantly or unexpectedly abnormal if the patient did not request them. These practices are precisely what led to the inadequate treatment at issue here. Moreover, Dr. Ghosh's testimony that he assumed certain follow up tests would be done in the hypertension clinic, and Dr. Zhang's lack of knowledge regarding which medical profession was responsible for determining

9

whether an inmate should be enrolled in the diabetic clinic highlight how Wexford's compartmentalized care resulted in inadequate medical care.

Based upon this record, viewed in the light most favorable to Nally, the Court finds that there is sufficient evidence from which a reasonable jury could find for Nally with respect to his claim against Wexford, and summary judgment is denied. *See Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004).

**Conclusion**

Based on the foregoing discussion, this Court denies defendants' Motion for Summary Judgment in its entirety [95].

IT IS SO ORDERED.

Date: 2/13/2019          Entered: _____
                                  SHARON JOHNSON COLEMAN
                                  United States District Court Judge